**Edward B. MISHKIN, as SIPA Trustee for the Liquidation of the Business of Alder, Coleman Clearing Corp., Plaintiff/Appellee,**

v.

**Roy AGELOFF, Robert F. Catoggio, Lowell Schatzer, Ronan Garber, Joseph Dibella, John Lembo, Mark A. Mancino, Joseph Scarfone, Chris Wolf, Randy M. Ashenfarb, Earl Rusnak, and Danny Garber, Defendants/Appellants,**

**Edward B. MISHKIN, as SIPA Trustee for the Liquidation of the Business of Alder, Coleman Clearing Corp., Plaintiff,**

v.

**Philip GURIAN, Tally Group, S.A., Rocena Company, Ltd., Ubiquity Holdings, Ltd., a/k/a Umbiquity Holdings, S.A., Maraval and Associates, Caspian Consulting, Ltd., and Bauman Ltd., Defendants.**

**Edward B. MISHKIN, as SIPA Trustee for the Liquidation of the Business of Alder, Coleman Clearing Corp., Plaintiff,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant.**

Nos. 97 Civ. 2690(LAP), 97 Civ. 4639(LAP), 97 Civ. 3817(LAP), 97 Civ. 4645(LAP), 97 Civ. 5201(LAP), 97 Civ. 3627(LAP), 97 Civ. 4640(LAP).

United States District Court, S.D. New York.

March 31, 1998.

Thomas J. Maloney, Cleary, Gottlieb, Steen & Hamilton, New York City, for Edwin B. Mishkin.

Andrew B. Schultz, Great Neck, NY, for Ronan Garber.

Paul F. Condzal, New York City, for John Lembo and Chris Wolf.

David J. Aronstam, New York City, for Mark A. Mancino.

Richard S. Gravante, Gravante, Gravante & Looby, Brooklyn, NY, for Randy M. Ashenfarb.

Michael P. Gilmore, Wexler & Burkhart, Mitchell Field, NY, for Earl Rusnak.

David Molton, Molton & Meekins, New York City, for Danny Garber.

Dale A. Schreiber, Proskauer, Rose, Goetz & Mendelsohn, L.L.P., New York City, for Roy Ageloff.

PRESKA, District Judge.

Pending before me in these matters are one appeal and various motions to withdraw the reference. In the action brought by Edwin B. Mishkin ("the Trustee") against defendant Roy Ageloff ("Ageloff"), *et al.* ("the Ageloff Proceeding"), Ageloff appeals from a Memorandum Decision, dated August 8, 1997 ("the August 8 Decision"), issued by the Honorable James L. Garrity, Jr. of the United States Bankruptcy Court for the Southern District of New York, granting the Trustee relief from the automatic stay provision of 15 U.S.C. § 78u–4(b)(3)(B), enacted as part of the reform package passed under the Private Securities Litigation Reform Act of 1995 ("the Reform Act"), section 21D(b)(3)(B). In addition, Ageloff, in arguments adopted by some of his codefendants, moves to withdraw the reference in this proceeding. Philip Gurian ("Gurian") and National Union Fire Insurance Company of Pittsburgh ("National Union") also move to withdraw the reference in their respective actions ("the Gurian Proceeding" and "the National Union Proceeding"). For the reasons that follow, both the appeal and the motions to withdraw the reference are granted.

## BACKGROUND

These actions all flow from the failure of Adler, Coleman Clearing Corp. ("Adler") in February of 1995. By Order dated February 27, 1995, and pursuant to 15 U.S.C. §§ 78eee(b)(3) & 78eee(b)(4), I appointed the Trustee and remanded this Securities Investor Protection Act ("SIPA") liquidation proceeding to the bankruptcy court.

Adler was a clearing firm and a member of the National Association of Securities Dealers, the National Securities Clearing Corporation ("NSCC") and the Securities Investors Protection Corporation ("SIPC"). One of the firms that Adler cleared for was Hanover Sterling & Company ("Hanover"). The Trustee claims that Adler's collapse was caused by Hanover's collapse. The Trustee further claims that Hanover's collapse was caused by a series of unlawful actions committed by the various individuals who are parties to the Ageloff and Gurian Proceedings. *See* Consolidated Memorandum of Law In Opposition to Defendants' Motions to Withdraw the Reference to the Bankruptcy Court of Three Adversary Proceedings, dated September 25, 1997, at 2 ("Trustee Withdrawal Mem.").

Before addressing the specific claims raised in each proceeding, a bit of background information about the relationship between Adler and Hanover is helpful. Hanover did not clear its own trades but rather relied upon Adler to do so. Hanover received buy and sell orders from its own customers and then relayed those orders to Adler. Adler held the cash and securities accounts for each of Hanover's customer accounts. After Adler cleared the trades, Adler sent trade confirmations and account statements directly to Hanover's customers. *See* Memorandum in Support of Motion of Defendant Roy Ageloff for Withdrawal of the Reference to the Bankruptcy Court, dated August 25, 1997, at 3–4 ("Ageloff Withdrawal Mem.").

Hanover underwrote certain initial public offerings and, after the initial offerings, was a market maker in the secondary markets for those issues. The parties refer to these issues as the "House Stocks." A significant portion of Hanover's assets consisted of positions in the House Stocks and, as a result, fluctuations in the value of the House Stocks affected Hanover's liquidity and net capital position.

### I. *The Gurian Proceeding*

In this proceeding, the Trustee alleges that Gurian, among others, unlawfully caused downward pressure on the price of the House Stocks by engaging in various criminal acts and ultimately, thereby, causing Hanover's collapse. *See* Complaint in this Adversary Proceeding, dated February 27, 1997 ("Gurian Complaint"), at ¶ 2; Annexed

as Ex. C to the Affidavit of Robert J. Feinstein, sworn to on May 15, 1996. Gurian was allegedly the undisclosed principal of two broker dealer firms that specifically targeted Hanover as a "vulnerable entity." *See id.* at ¶¶ 4–6. It is further alleged that Gurian and the other defendants herein profited from this unlawful scheme by selling short the House Stocks. *See id.* at ¶¶ 10–11. The Gurian Complaint pleads RICO, federal and state anti-trust, federal securities, and common law fraud and deceit causes of action and seeks at least $200,000,000 in damages.

At the end of the day, the Gurian Complaint alleges that this scheme caused, and was intended to cause, Hanover's collapse. *See id.* at ¶ 2 & 10. Hanover's collapse in turn allegedly caused Adler's collapse because after Hanover's failure, Hanover was unable to meet its trading obligations. Adler, as Hanover's clearing firm, guaranteed these obligations, and the magnitude of Hanover's losses caused Adler to fail. Nonetheless, Hanover's customers, including the defendants herein, were protected, beyond the losses that Adler absorbed, because NSCC guaranteed Adler's clearing function. Thus, in brief and as alleged by the Trustee, these defendants caused Adler and Hanover to collapse, that failure in turn brought tremendous financial gain to these defendants, and Adler and NSCC paid for the fraud. *See id.*[1]

## II. *The Ageloff Proceeding*

In response to the downward pressure the defendants in the Gurian Proceeding allegedly put on the House Stocks, the defendants in the Ageloff Proceeding, Hanover employees, allegedly engaged in a fraudulent scheme to inflate the value of the House Stocks. This unlawful upward pressure was allegedly caused by booking massive numbers of sham purchases in the House Stocks. These sham purchases were cleared through Adler. *See* Complaint in this Adversary Proceeding, dated February 27, 1997, at ¶¶ 41–42 ("Ageloff Complaint"); Annexed as Ex. 3 to the Affida-

vit of Mitchell A. Lowenthal in Opposition to Defendants' Motions to Withdraw the Reference in Three Adversary Proceedings, sworn to on September 22, 1997.

In spite of this fraudulent scheme, at some point in time it allegedly became apparent to the Hanover insiders that Hanover could not survive the fraud being perpetrated by the defendants in the Gurian Proceeding. As a result, the Hanover insiders allegedly commenced a second fraudulent scheme to maintain the good will of Hanover's favored customers and to shift the losses away from these favored customers to Adler and SIPC. The complicated mechanism for perpetrating this alleged scheme was as follows.

Hanover's favored customers "sold" the House Stocks at artificially inflated prices to Hanover's proprietary account. Hanover in turn purported to "sell" these House Stocks to other unwitting Hanover customers who were unaware of the purported purchases being made on their behalf. *See id.* at ¶¶ 48, 51–51. Hanover allegedly never intended any of these transactions to clear. *See id.* at ¶¶ 6 & 49. After Hanover collapsed, and the House stocks plummeted in value, the favored customers would nevertheless have claims under SIPA for the "sales" of the House Stock at artificially inflated prices. *See id.* at ¶ 47. Again, Adler, as clearing broker, was left guaranteeing these transactions and, overwhelmed by the number and value of the transactions, collapsed. *See id.* at ¶ 8 & 44. In short, the Trustee alleges that the Ageloff defendants perpetrated a scheme whereby the favored customers were able to obtain artificially high prices for the House Stocks at Adler's and SIPC's expense. *See id.* at ¶ 48.

The Ageloff Complaint pleads causes of action under section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5, section 20(a) of the Exchange Act and for common law fraud and deceit. The complaint seeks at least $70,000,000 in damages and was filed on Febru-

---

**1.** Gurian originally moved to dismiss this complaint. That motion was subsequently withdrawn without prejudice. *See* Consent Order Withdrawing Motion to Dismiss and Motion For a Stay, and Agreeing To Discovery, dated August 25, 1997; Annexed as Ex. E to the Affirmation of Mitchell A. Lowenthal in Opposition to Appellants' Motion Seeking to Reverse the Bankruptcy Court's Order Permitting Discovery to Proceed, sworn to on September 5, 1997.

ary 27, 1997. By notice of motion dated April 10, 1997, Ageloff filed the instant motion to withdraw the reference of this proceeding. Two weeks later, on April 25, 1997, Ageloff, and several other defendants, moved to dismiss this complaint. On July 2, 1997, the bankruptcy court heard oral argument on the motion to dismiss.

## A. The August 8 Decision

By virtue of having filed a motion to dismiss, Ageloff triggered an automatic stay of all discovery in the Ageloff Proceeding. See 15 U.S.C. § 78u–4(b)(3)(B). By notice of motion dated May 9, 1997, the Trustee moved for relief from that stay. The August 8 Decision, as discussed in greater detail *infra*, granted the Trustee this relief. See August 8 Decision; Annexed as Ex. 11 to the Declaration of Dale. A. Schreiber in Support of Defendant Roy Ageloff's Appeal, dated August 25, 1997 ("Schreiber Dec."). On August 25, 1997, Judge Garrity issued a confirming order. See Affidavit of Mitchell A. Lowenthal in Opposition to Appellants' Motion Seeking to Reverse the Bankruptcy Court's Order Permitting Discovery to Proceed, sworn to on September 5, 1997; Ex. B ("the August Order"). By Stipulation and Order dated September 10, 1997, and after conference with the parties, the parties agreed to a briefing schedule with respect to Ageloff's appeal to this Court from the August 8 Decision and provided a method to address the effect my decision would have upon discovery in the underlying action. See Schreiber Dec.; Ex. 12 ("the September Order").

## III. The National Union Proceeding

The last chapter in this trilogy of adversary proceedings involves the ever-present litigant in complex commercial litigation, the insurance company. On January 1, 1995, National Union allegedly issued a Financial Institution Bond ("the Bond") in favor of Adler. See Complaint in this Adversary Proceeding, dated March 14, 1997, at ¶ 4 ("the National Union Complaint"); Annexed as Ex. 1 to the Affirmation of Kevin J. Windels in

Support of Motion to Withdraw Reference, sworn to on May 12, 1997 ("Windels Aff."). The Bond provides coverage up to $10,000,000, with a single loss deductible of $250,000, and purportedly covers the losses Adler incurred by virtue of Hanover's fraudulent acts. See *id.* at ¶¶ 5 & 7.

## DISCUSSION

### I. The Appeal from the August 8 Decision

Ageloff appeals from the August 8 Decision granting the Trustee relief from the automatic stay of discovery imposed by section 21D(b)(3)(B) of the Reform Act, title 15, section 78u–4(b)(3)(B). A brief summary of this decision follows. Initially, the bankruptcy court rejected the Trustee's argument that the Reform Act does not apply to SIPA trustees. See August 8 Decision at 6–10. In addition, as to the first of two statutory exceptions to imposition of the automatic stay, the court rejected the Trustee's argument that relief from the automatic stay was necessary to avoid the destruction of evidence. See *id.* at 10–11. The court also held, however, that the second statutory exception applied, the need to avoid undue prejudice, and thus granted the Trustee relief from the automatic stay. See *id.* at 11–17.[2] It is from this latter holding that Ageloff appeals. The Trustee does not cross-appeal any issue adversely decided against him in the August 8 Decision.

In briefing this appeal, the parties focus on whether the Trustee has satisfied his burden of establishing undue prejudice. I do not reach the merits of that question. Rather, as Ageloff correctly points out, the statute also requires the Trustee to articulate a need for "particularized discovery" necessary to avoid undue prejudice. See Memorandum of Roy Ageloff in Support of Appeal from the August 8, 1997 Decision of the Bankruptcy Court Vacating the Automatic Stay Provision of the Private Securities Litigation Reform Act, dated August 25, 1997, at 4 & 8 ("Ageloff Appeal Mem."); Reply Memorandum of

---

**2.** These articulations of the bankruptcy court's holdings noticeably do not include any indication of the particularized discovery requirement. The absence of that requirement reflects the bankruptcy court's holding and should not be read to indicate that the requirement of particularized discovery does not apply. This is an issue addressed more fully, *infra*.

Roy Ageloff in Support of Appeal from the August 8, 1997 Decision of the Bankruptcy Court Vacating the Automatic Stay Provision of the Private Securities Litigation Reform Act, dated September 12, 1997, at 9 ("Ageloff Reply Appeal Mem."). Because the bankruptcy court did not address this issue, and because I find that the Trustee has not sustained its burden of articulating "particularized discovery" necessary to avoid undue prejudice, the August 8 Decision is hereby reversed and the August Order hereby vacated.

### A. *Jurisdiction to Hear the Appeal*

In addition to his arguments on the merits, the Trustee also argues that I lack jurisdiction to hear this appeal. Ageloff relies upon 28 U.S.C. § 158(a)(3) in appealing the August 8 Decision; which provides in pertinent part as follows: "The district courts of the United States shall have jurisdiction to hear appeals ... with leave of the court, from other interlocutory orders and decrees...."

■ Referring to the September Order, the Trustee is certainly correct that parties to a litigation cannot, by stipulation, confer subject matter jurisdiction upon a court. *See* Memorandum of Law in Opposition to Appellants' Motion Seeking to Reverse the Bankruptcy Court's Order Permitting Discovery to Proceed, dated September 8, 1997, at 13–14 ("Trustee Appeal Mem."). Nonetheless, it was my perhaps unstated but implicit intent at the conference which gave rise to the September Order to grant Ageloff, as section 158(a)(3) provides, leave to appeal the August 8 decision. To the extent that this intent was not previously made clear, I do so herein.

Courts in this district have incorporated the standards applicable to interlocutory appeals under 28 U.S.C. § 1292(b) when evaluating whether to grant an appeal under section 158(a)(3). *See, e.g., Back v. LTV Corp. (In re Chateaugay Corp.),* 213 B.R. 633, 636 (S.D.N.Y.1997); *United States Lines, Inc. v. American Steamship Owners Mutual Pro-*

*tection and Indemnity Assoc., Inc. (In re United States Lines, Inc.),* 199 B.R. 465, 471 (S.D.N.Y.1996); *Robinson v. Silverman (In re Johns–Manville Corp.),* 47 B.R. 957, 960 (S.D.N.Y.1985). Indeed, on one prior occasion, I have done the same. *See Fischer v. 47th Street Photo, Inc.,* No. 92 Civ. 6529(LAP), 1993 WL 126525, at *3 (S.D.N.Y. April 22, 1993). The Court of Appeals does not appear to have addressed this precise issue. *Cf. Flor v. BOT Financial Corp. (In re Flor),* 79 F.3d 281, 283 (2d Cir.1996) (tracking, in what appears to be the only Court of Appeals' decision discussing the current version of section 158(a)(3), the language of section 158(a)(3) and indicating, in dicta, that district courts have the authority to hear appeals from nonfinal orders "with leave of the court").

■ At the same time, courts have recognized that neither section 158(a)(3) nor the Bankruptcy Code specifically delineates the criteria which govern a section 158(a)(3) appeal. *See, e.g., Official Bondholders Committee v. Chase Manhattan Bank (In re Marvel Entertainment Group, Inc.),* 209 B.R. 832, 837 (D.Del.1997); *Merchants Bank v. Vescio,* 205 B.R. 37, 40 (D.Vt.1997); *In re Johns–Manville Corp.,* 47 B.R. at 960. Nonetheless, these and the other cases discussed *supra* have continued to adopt the section 1292(b) standards. In a well-reasoned analysis, the United States District Court for the District of Rhode Island rejected this approach of automatic adoption of the section 1292(b) standard. *See Williams v. United States (In re Williams),* 215 B.R. 289, 298 n. 6 (D.R.I.1997) (granting leave to appeal from an order imposing monetary sanctions); *cf. Sonnax Indust., Inc. v. Tri Component Products Corp., (In re Sonnax Indust., Inc.),* 907 F.2d 1280, 1283 n. 1 (2d Cir.1990) (discussing the previous version of section 158(a)(3)[3] and stating in dicta that this version "authorize[d] district courts to hear appeals from interlocutory orders by *discretionary leave* of the district court....") (emphasis added); *Bertoli v.*

---

**3.** Effective October 22, 1994, the prior version of section 158(a)(3) was amended to its current form. The prior version of this section did not separately delineate the three sub-headings that the current version separately delineates. Thus,

under the prior version, reference to section 158(a) included reference to interlocutory appeals, which is now specifically contained in section 158(a)(3).

*D'Avella (In re Bertoli),* 812 F.2d 136, 139 (3d Cir.1987) (collecting dicta from the Seventh and Ninth Circuit Courts of Appeals addressing the prior version of section 158(a)(3) to the effect that, respectively, a district court "may elect" or "may grant leave" to hear an interlocutory appeal).[4] *But see Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.),* 218 B.R. 643, 651–52 (1st Cir. BAP 1998) (noting the *In re Williams* decision but adopting, without analysis, the section 1292(b) standard). For reasons more fully developed in the *In re Williams* decision, I also find that rigid adherence to the section 1292(b) standard is not appropriate in this case. *See* 215 B.R. at 298 n. 6; *see also Vescio,* 205 B.R. at 40 (noting the absence of a required standard, indicating that courts "ordinarily" apply the section 1292(b) standard and that discovery orders are "ordinarily nonappealable," but applying that standard and nonetheless granting leave to appeal to resolve whether a "bank examination privilege" exists). ·

▪ I find further support for the adoption of this approach in the fact that the concept of finality is viewed with greater flexibility in the bankruptcy context. *See, e.g., In re Flor,* 79 F.3d at 283; *Victor v. Edison Brothers Stores, Inc. (In re Edison Brothers Stores, Inc.),* No. Civ. A. 96–177–SLR, 1996 WL 363806, at *2 (D.Del. June 27, 1996); *Fischer,* 1993 WL 126525, at *1. Because the concept of finality is significantly and integrally linked to the standard for granting interlocutory appeals (insofar as appeals from final orders are not interlocutory in nature), a flexible approach to the concept of finality in the bankruptcy context supports a similarly flexible approach to the standard for granting interlocutory appeals from interlocutory orders of a bankruptcy court. In addition, the Court of Appeals has indicated that its appellate jurisdiction is more limited than the district courts vis-a-vis bankruptcy appeals. *See In re Flor,* 79 F.3d at 283. This fact also supports adoption of ·a standard, at the district court level, for determining whether to hear discretionary appeals which takes into account this broader jurisdiction and which is not automatically tied to a standard that is designed to limit, in a different context, the number of appeals to the Court of Appeals.

▪ In short, under the unique set of circumstances presented herein,[5] I do not rely upon the criteria set forth in section 1292(b) in deciding whether to grant Ageloff's appeal and I further exercise my discretion pursuant to section 158(a)(3) to hear Ageloff's interlocutory appeal of the August 8 Decision. *Cf. Medhekar v. United States District Court for the Northern District of California,* 99 F.3d 325, 326–27 (9th Cir.1996) (granting a

---

4. In *In re Bertoli,* the court indicated that a district court could grant leave to hear an interlocutory order "for such cause as found by the district court here." 812 F.2d at 139. As the court in *In re Williams* explained, the overall reasoning of the *In re Bertoli* court supports adoption of a more flexible approach to interlocutory appeals from bankruptcy court orders than that encompassed by section 1292(b). Nonetheless, the *In re Bertoli* court's language "by the district court here" links the "cause shown" to the methodology employed by the "district court here[,]" and the district court there employed the section 1292(b) standard. *See In re Bertoli,* 812 F.2d at 137; *see also Official Bondholders Committee v. Chase Manhattan Bank (In re Marvel Entertainment Group),* 209 B.R. 832, 837 (D.Del. 1997) (noting this fact and adopting the section 1292(b) standard); *Michigan Bureau of Workers' Dis. Comp. v. Chateaugay Corp. (In re Chateaugay Corp.),* 80 B.R. 279, 285 (S.D.N.Y.1987) (citing the district court decision in *In re Bertoli* for the proposition that adoption of the section 1292(b) standard is appropriate).

5. So that the record is clear, these circumstances are as follows: (1) the unstated, but implicit assumption, that I would entertain Ageloff's appeal; (2) the fact that the issues raised on this appeal are important ones of apparent first impression; and (3) the fact that, as discussed *infra,* I have also decided to withdraw the reference with respect to these proceedings. I further note that I do not intend this decision to stand for the proposition that adoption of the section 1292(b) criteria is erroneous. Given that section 158(a)(3) leaves the question of whether to grant leave to appeal to the discretion of the district court, it seems to me that there is nothing *per se* inappropriate about a district court's using the criteria in section 1292(b) to inform that discretion. Rather, I hold that based upon the unique facts of this case, the criteria in section 1292(b) should not be adopted and that leave should be granted.

writ of mandamus with respect to a district court's order granting relief from the Reform Act's automatic stay).

### B. *The Merits of the Appeal*

Initially, I must determine what standard of review to apply to the August 8 Decision. One standard is clear, but not particularly relevant on this appeal. Findings of fact ·cannot be set aside unless clearly erroneous. *See* Fed.R.Bankr.P. 8013. Conclusions of law are subject to de novo review. *See, e.g., New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.),* 981 F.2d 85, 89 (2d Cir. 1992). Nonetheless, district courts occasionally apply an abuse of discretion standard when reviewing some bankruptcy court orders. *See S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.),* No. 96 Civ. 5801(JFK), 1997 WL 31197, at *8 (S.D.N.Y. Jan. 28, 1997) (collecting cases addressing motions to compel arbitration and the scope of permissible discovery). Indeed, in the related context of appeals from orders lifting the stay under 11 U.S.C. § 362, the Court of Appeals applies an abuse of discretion standard. *See In re Sonnax,* 907 F.2d at 1286. This is a quagmire I need not clear. Applying either standard, the August 8 Decision is reversed because it failed to address a requirement of the statutory scheme.

Title 15, section 78u–4(b)(3)(B), added as part of the Reform Act amendments (section 21D(b)(3)(B)), provides as follows:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

As discussed above, the focus of this appeal is on the second statutory exception, "that particularized discovery is necessary ... to prevent undue prejudice...." The August 8 Decision did not address the "particularized discovery" language, and Ageloff appeals, in part, based upon that failure.

In urging affirmance, the Trustee asserts two arguments. First, the Trustee argues that the "particularized discovery" standard only applies to the "necessary to preserve evidence" exception. Second, the Trustee submits that even if the "particularized discovery" standard applies to the "undue prejudice" exception, it has satisfied that standard. *See* Trustee Appeal Mem. at 21–22. For the reasons that follow, I reject both arguments.

In arguing that the "particularized discovery" requirement only applies to the "necessary to preserve evidence" exception, the Trustee relies upon *Medical Imaging Centers of Am., Inc. v. Lichtenstein,* 917 F.Supp. 717 (S.D.Cal.1996). There, in the course of summarizing section 78u–4(b)(3)(B), the court stated as follows:

> At issue in this case is a new section of the 1934 Act, added by the Reform Act, which mandates a stay of discovery whenever a motion to dismiss is pending, unless either or both of two statutorily prescribed exceptions to that mandate apply as follows: (1) "particularized discovery is necessary to preserve evidence" or (2) "to prevent undue prejudice to that party."

*Id.* at 720 (quoting 15 U.S.C. § 78u–4(b)(3)(B)). The Trustee seizes upon the fact that the *Medical Imaging* court did not attach the "particularized discovery" requirement to the court's articulation of the undue prejudice exception. Since the *Medical Imaging* court ultimately concluded that the party seeking application of the undue prejudice exception had not established undue prejudice, *see id.* at 721–22, it may well be the case that the court did not need to reach the question of whether that party had articulated a need for "particularized discovery." Nor is there any indication that the *Medical Imaging* court was required to address the precise argument raised by the Trustee. Regardless, to the extent that the holding in *Medical Imaging* can be read to eliminate the particularized discovery requirement in the undue prejudice exception, I reject that holding.

■ The plain language of the statute, in relevant part, provides as follows: "unless the court finds ... that particularized discovery is necessary to preserve evidence or to

prevent undue prejudice to that party." 15 U.S.C. § 78u–4(b)(3)(B). Structurally, there is no indication that the "particularized discovery" language only applies to the "preserve evidence" exception. In fact, quite the opposite is true. Reading the language as enacted, I must find that something "is necessary . . . to prevent undue prejudice." The something that I must find is clearly "particularized discovery." *Cf. In re Diamond Multimedia Sys., Inc. Sec. Lit.*, No. C 96–2644(SBA), 1997 WL 773733, at *3 (N.D.Cal. Oct. 14, 1997) (indicating that "the statute provides relief from the stay where a party has established that 'particularized discovery is necessary. . . .' ") (omission in original and quoting 15 U.S.C. § 78u–4(b)(3)(B)). Had Congress intended for the particularized discovery requirement to only apply to the preservation of evidence exception, it could have drafted the statute, for example, as follows: unless the court finds that particularized discovery is necessary to preserve evidence or that imposition of the automatic stay would cause undue prejudice to that party. The language of the statute as drafted, however, links the particularized discovery requirement to the undue prejudice exception. As a result, I reject the Trustee's first argument.

▮ Accordingly, I turn to the question of whether the Trustee has articulated particularized discovery necessary to prevent undue prejudice. In resolving this question, I again point out that the August 8 Decision did not address the particularized discovery requirement. The court focused exclusively on the undue prejudice issue. Nonetheless, the Trustee attempts to avoid the absence of such an analysis by arguing that it has satisfied the particularized discovery requirement anyway. Because the Trustee's arguments are critical to resolving this question, they are worth quoting in full:

> Second, the Trustee has specified what discovery he needs now—documents and testimony from the defendants, former Hanover customers (some of whom are referred to in the Ageloff Complaint) and third parties, such as Hanover back office

employees. Although the Trustee has not listed the names of the customers he intends to depose, Appellants cannot reasonably claim that under the circumstances here the statute requires him to do so. No valid interest would be served by forcing the Trustee to reveal his work product by delineating in advance each piece of discovery he intends to pursue, then requiring a separate motion before the Bankruptcy Court before proceeding. Where, as here, undue prejudice results from the duplication of discovery, all discovery that is necessary in more than one proceeding is properly permitted in this action. That is precisely what the Bankruptcy Court so held.

Trustee Appeal Mem. at 21–22. This paragraph represents the Trustee's entire argument with respect to the particularized discovery requirement and raises many matters worth commenting upon.

I turn first to the Trustee's suggestion that he has satisfied the particularized discovery requirement by specifying "documents and testimony from the defendants, former Hanover customers (some of whom are referred to in the Ageloff Complaint) and third parties, such as Hanover back office employees." Admittedly, the concept of particularized discovery is a nebulous one, and the phrase is not devoid of ambiguity, but one thing is clear, if that requirement were satisfied based upon the degree of specificity urged by the Trustee, it would be rendered meaningless. The items of discovery sought by the Trustee encompass an open-ended, boundless universe of discovery. Far from particularized, it is basically a request to continue any and all discovery that may arise. Again, whatever the meaning of the phrase particularized discovery, and I need not decide its outer and inner confines herein, the Trustee has not satisfied it.

Second, the Trustee claims that requiring any greater degree of specificity, such as a list of customers' names, would serve "[n]o valid interest" and would force the Trustee to "reveal his work product." [6] Reading this

---

6. In a corollary to this argument, the Trustee appears to argue that the particularized discovery requirement would require, with respect to

each piece of discovery, a "separate motion before the Bankruptcy Court before proceeding." Trustee Appeal Mem. at 22. The answer to this

latter argument as an assertion of work product privilege, it need not detain me long. It is difficult to perceive how the names of the individuals to be deposed, or the documents to be sought, or the interrogatories to be asked, could possibly be privileged. After all, in order to obtain these things, the Trustee must eventually ask Ageloff for them. Nonetheless, even assuming that these items could be privileged, the Trustee has fallen far short of overcoming the burden necessary to establish privilege. As to the alleged lack of a valid interest that would be served in requiring a greater degree of specificity, this is, fortunately, an argument that Congress has already addressed. Congress imposed the requirement of "particularized discovery" and, regardless of the policy reasons why such a requirement may or may not be a good idea, the statute plainly requires it. Had the Trustee come closer to meeting that requirement, there might have been reason to address those policy concerns in the context of competing arguments concerning the degree of particularization imposed by the statute. But, where, as is the case here, the Trustee has again fallen far short of making even a pretense of satisfying that standard, those policy arguments are unavailable to the Trustee.

Third, I reach the Trustee's final argument that "[w]here, as here, undue prejudice results from the duplication of discovery, all discovery that is necessary in more than one proceeding is properly permitted in this action." It is worth pausing to examine how far the Trustee's argument has come from its initial articulation some two sentences ago. At the beginning of this paragraph, the Trustee argued that it had satisfied the par-

ticularized discovery requirement by "specify[ing] what discovery he needs now[.]" Perhaps implicitly recognizing that this alleged "specification" was nothing but the boundless and open-ended request that I have found it to be, the Trustee now argues that because undue prejudice results in the duplication "of discovery, all discovery that is necessary" should proceed. In other words, rather than argue that the degree of specificity necessary to satisfy the statute has been met, the Trustee concludes by arguing that, because of the unique facts of this case, the particularized discovery requirement does not apply and that "all discovery that is necessary" should be permitted.

I have already rejected this argument in holding that the Trustee must establish, as the statute plainly requires, what particularized discovery is necessary to prevent undue prejudice. Moreover, to the extent that the Trustee argues that it should be relieved of the particularized discovery requirement because of the unique facts of this action, I reject that argument as well. First, I note that the August 8 Decision rejected a similar argument raised by the Trustee; namely; that section 78u–4(b)(3)(B) does not apply to SIPA trustees. *See* August 8 Decision at 6–10. The argument raised herein is really just another, although more narrowly tailored, version of the argument which Judge Garrity rejected. Judge Garrity found that "[t]his litigation plainly falls within the scope of the Reform Act[ ]" and further disagreed with the Trustee that "the act [is] inapplicable on the basis of the peculiar facts of this case." *Id.* at 10. For the same reasons that he did so, so, too, do I. Second, other courts have rejected similar arguments from liti-

argument reveals a more fundamental flaw in the Trustee's reasoning. The particularized discovery requirement should be addressed in the first instance when a motion for relief from the stay is made. At that time, the allegedly necessary discovery can be addressed and evaluated. Thus, the particularized discovery requirement will not necessarily entail multiple trips back to a court for relief (leaving room, of course, for those instances where subsequent events may require a subsequent motion). The Trustee's argument is based upon his erroneous belief that he should not have to specify this discovery up-front, but rather should be allowed to adopt a wait-and-see approach to the particularized discovery require-

ment. In other words, the Trustee suggests that multiple motions will be necessary because he can only provide a greater degree of specificity with respect to the necessary discovery as the case progresses. The argument falters on its assumption that this manner of compliance satisfies the particularized discovery requirement. Because the Trustee must articulate the specific discovery necessary to avoid undue prejudice now, not at a later, unspecified date, the particularized discovery requirement will not impose multiple motions on the bankruptcy court each time discovery is sought. Stated more informally, as far as the particularized discovery requirement is concerned, it's now or never.

gants seeking to carve out special exceptions, based upon arguably unique circumstances, from the broad language ("any private action") adopted by Congress. *See, e.g., In re Trump Hotel Shareholder Derivative Lit.,* No. 96 Civ. 7820(DAB)(HBP), 1997 WL 442135, at *1 (S.D.N.Y. Aug. 5, 1997) (rejecting argument that the automatic stay provision does not apply to derivative actions); *Medical Imaging,* 917 F.Supp. at 721 (rejecting argument that the automatic stay provision does not apply to injunction actions filed by corporations); *see also Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 985 F.Supp. 427, 429–31 (S.D.N.Y.1997) (Pollack, J.) (relying upon these and other authorities in rejecting a similar argument with respect to similar language in section 21D(c)(1) of the Reform Act, 15 U.S.C. § 78u–4(c)(1), which requires a district court, upon final adjudication of an action, to make specific findings regarding compliance with Rule 11).

In sum, the August 8 Decision did not address the "particularized discovery" requirement. On appeal, the Trustee has attempted to cure that deficiency by arguing either that it is not a requirement or that the Trustee has satisfied it. For the reasons addressed herein, I reject both of these arguments. As a result, and because the failure to address this requirement was either a clear legal error or an abuse of discretion, Ageloff's appeal is granted, the August 8 Decision is hereby reversed and the August Order hereby vacated.

## II. *The Motions to Withdraw the Reference*

### A. *The Ageloff Proceeding*

Pursuant to 28 U.S.C. § 157(a), Congress granted district courts authority to refer to bankruptcy judges "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11." By order dated July 10, 1984, this Court issued the "Standing Order of Referral of Cases to Bankruptcy Judges." As a result, all cases which satisfy the criteria set forth in section 157(a) are automatically referred to the bankruptcy court.

At the same time that Congress granted district courts this authority, it also recognized, consistent with the holding of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), that sometimes that reference should, and indeed must, be withdrawn and a case returned to an Article III court. Title 28, section 157(d) embodies this concern:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on the timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

Courts have held, and the parties do not dispute, that this provision, and the cases interpreting it, apply in SIPA proceedings. *See, e.g., Keller v. Blinder (In re Blinder, Robinson & Co.),* 162 B.R. 555, 559 (D.Colo. 1994).

Section 157(d) sets forth two grounds for withdrawal; one mandatory, the other permissive. With respect to mandatory withdrawal, case law in this circuit is well-settled that in order to grant mandatory withdrawal, I must find that the matters raised in these proceedings or claims require "significant interpretation, as opposed to simple application" of non-bankruptcy federal law. *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir.1991); *see also Bousa, Inc. v. United States (In re Bulk Oil (USA), Inc.),* 209 B.R. 29, 30 (S.D.N.Y.1997) (articulating a variation of this standard, "substantial and material consideration" of non-bankruptcy federal statutes); *LTV Steel Co. v. Union Carbide Corp. (In re Chateaugay Corp.),* 193 B.R. 669, 673 (S.D.N.Y.1996); *Keene Corp. v. Williams Bailey & Wesner, L.L.P. (In re Keene Corp.),* 182 B.R. 379, 382 (S.D.N.Y. 1995); *Shugrue v. Chemical Bank, Inc. (In re Ionosphere Clubs, Inc.),* No. 94 Civ. 4614(JFK), 1995 WL 479480, at *2 (S.D.N.Y. Aug. 11, 1995); *Revere Copper and Brass, Inc. v. Acushnet (In re Revere Copper and*

*Brass, Inc.),* 172 B.R. 192, 196 (S.D.N.Y. 1994); *International Assoc. of Machinists and Aerospace Workers v. Eastern Air Lines, Inc. (In re Ionosphere Clubs, Inc.),* 103 B.R. 416, 419 (S.D.N.Y.1989). Courts also generally agree that where matters of first impression are concerned, the burden of establishing a right to mandatory withdrawal is more easily met. *See, e.g., In re Keene Corp.,* 182 B.R. at 382; *In re Ionosphere Clubs,* 103 B.R. at 419–20.

■ Both sides are particularly adept at citing these and legions of other cases from this and other circuits applying this standard. Other than for purposes of setting forth the applicable standard, and providing a general sense of the nature of the inquiry I must make, these cases are of limited usefulness. This inquiry is necessarily fact specific, and absent a decision involving virtually identical claims on an equally identical set of facts, reference to prior decisions is of marginal assistance. *See In re Keene Corp.,* 182 B.R. at 382 ("[M]andatory withdrawal is a fact specific determination, and thus necessarily involves analysis in light of the circumstances involved in each case."); *In re Ionosphere Clubs,* 103 B.R. at 419 (observing that the "substantial and material" standard is "amorphous"). Thus, rather than pursue the lengthy analysis of the cases engaged in by the parties, I turn directly to the heart of the matter—application of this general standard to this specific set of facts.[7]

Before doing so, it is appropriate to make an initial, cautionary statement. Ageloff's motion to dismiss is *sub judice* before the bankruptcy court. In seeking withdrawal, Ageloff asks me to determine that a particular claim or theory is novel, complicated or otherwise requires significant interpretation of non-bankruptcy federal law. Frequently, the Trustee opposes these arguments by suggesting that settled law resolves the matter. It occurs to me that in the course of answering these questions, I may, in effect, be rendering an advisory opinion on the pending motions to dismiss. The parties should note that I have absolutely no intention of doing so and have attempted to avoid expressing any such opinions. Nothing contained herein should be read, one way or the other, as expressing any opinion on Ageloff's pending motion.

Turning to the merits, as Ageloff correctly observes, to a large extent, this case has already generated an issue of importance and first impression vis-a-vis interpretation and application of non-bankruptcy law—the issues discussed *supra,* with respect to the Reform Act's automatic stay provision.[8] The Trustee's response to this fact is as follows: "As to the lift-stay order dwelt on at some length by Ageloff, the Bankruptcy Court's consideration of the Reform Act *is* complete: Judge Garrity issued a lengthy opinion on August 8, one Ageloff has already purported to appeal." Trustee Withdrawal Mem. at 16 n. 19 (emphasis in original). Putting aside for the moment the question of whether "consideration of the Reform Act is complete[,]" this argument does nothing to undermine the fact that this litigation has already generated important matters of first impression. That is a fact which cannot be denied. Although, by virtue of my resolution of Ageloff's appeal, this matter has been resolved, its resolution does not render it an irrelevant factor in the mandatory withdrawal analysis and I have considered this novel and important issue in determining whether withdrawal is required.

---

7. I pause only to address one other small issue to which the Trustee devotes a large portion of his opposition memorandum of law. The Trustee reads some of the statements made in the various moving memoranda of law as indicating that counsel for the movants perceives that the existence of certain claims mandates withdrawal without any inquiry as to the specific nature of the claims. The movants argue that this is a straw man intended to divert my attention away from the case-specific inquiry I am required to make. Regardless, to the extent that any party has suggested that there exists *per se* rules with respect to mandatory withdrawal, as the discussion *supra* makes clear, I reject such an argument. The law in this area is quite clear that resolution of these types of withdrawal motions requires case-by-case analysis.

8. Although not inconsistent with this statement, I note that since the parties briefed this issue, one court has granted limited relief from the automatic stay to serve, but not enforce, subpoenas duces tecum upon various third-parties. *See In re Grand Casinos, Inc. Sec. Lit.,* 988 F.Supp. 1270 (D.Minn.1997).

As to the question of whether "consideration of the Reform Act is complete," the simple answer to that is that the Trustee already conceded first that such consideration is not complete and second that the manner that consideration must take is also the subject of some debate. At oral argument on the pending motions to dismiss, counsel for the Trustee, in the course of addressing various pleading issues raised in the motions to dismiss, stated as follows:

> The Defendants point out that *there's a debate whether the motive and opportunity prong survives after the Reform Act,* and there is a recent decision by Judge Baer in this District which says it doesn't, that all you must prove strong [sic] circumstantial evidence of conscious misbehavior.
>
> *Whatever the outcome of that debate,* we think we proved both. Although I will point out that the common law fraud claim is clearly subject to either standard [sic], because the Reform Act doesn't apply to it.

Transcript of Oral Argument, dated July 2, 1997, at 71–72; Supplemental Declaration of Dale A. Schreiber in Support of Defendant Roy Ageloff's Appeal; Ex. 1 (emphasis added) ("Oral Argument Tr."). Thus, the Trustee has already recognized that: (1) the Reform Act's pleading requirements are an issue with respect to the pending motions to dismiss (contrary to the suggestion that consideration of the Reform Act "is complete");[9] and (2) these pleading issues represent an area of unsettled and developing law. In fact, since Judge Baer's decision in

*Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205 (S.D.N.Y.1997), courts in this circuit have continued to struggle with the implications of the Reform Act to pleading standards. *See, e.g., Press v. Chemical Investment Services Corp.,* 988 F.Supp. 375, 390, n. 21 (S.D.N.Y.1997) (Cote, J.) (noting that courts in this circuit have reached different results on the question of whether the Reform Act has heightened the pleading requirement for scienter and collecting cases addressing the same); *Western Heart Inst. P.C. v. Buenos Aires Embotelladora S.A. (In re Baesa Sec. Lit.),* 969 F.Supp. 238, 241–42 & nn. 1–2 (S.D.N.Y.1997) (Rakoff, J.) (discussing the purported error of cases such as *Norwood* in elevating language in legislative history over the clear language of the statute); *In re Health Management, Inc. Securities Lit.,* 970 F.Supp. 192, 200–01 (E.D.N.Y.1997) (Spatt, J.) (noting that the pleading standards issue has been "the source of debate among some courts[,]" specifically discussing *Norwood* and *In re Baesa,* and adopting, but only in part, the view expressed in *In re Baesa* ). In light of this debate, and its clear relevance to the present matter and the pending motions to dismiss, it is difficult to perceive of a factor that could more substantially support a finding that withdrawal is required.

In attempting to avoid this conclusion, the Trustee makes a number of arguments, none of which dissuades me from reaching this conclusion. First, the Trustee argues that the motions to dismiss "may soon be decid-

---

9. In a related manner, I note one other apparent inconsistency between the Trustee's position at oral argument and his current position. At oral argument, the Trustee made the following statements:

> We allege that this was a conspiracy, in which each Defendant no only agreed to work with one another, but in which each Defendant in fact affirmatively took acts to perpetrate it.
>
> Again, there is a debate in light of *Central Bank* whether 10(b)(5) conspiracy liability survives that decision.
>
> Judge Knapp, in the *Towers Financial* case, says that it does survive, and facts like ours, in which it's not simply a group of people agreeing with one person perpetrating the acts.
>
> But however one comes out on that, we sued them under common law fraud as well, and there is no question that under common law fraud, co-conspirator liability continues.

Oral Argument Tr. at 75–76. In *Dinsmore v. Squadron, Ellenoff,* 135 F.3d 837 (2d Cir.1998), decided after this oral argument, the Court of Appeals resolved this "debate" and held that *Central Bank* bars a cause of action for conspiracy under Rule 10b–5. In a letter to the Court dated February 13, 1998, counsel for the Trustee, in response to a letter from counsel for Ageloff, stated that *Dinsmore* was irrelevant to this proceeding. The arguments raised by the Trustee in this letter ignore the very claims counsel addressed at oral argument and the very debate to which counsel specifically referred. Frankly, I am troubled by this because it appears that one problem that has permeated this action thus far is a peculiar lack of clarity and consistency with respect to the precise claims that the Trustee raises. *See* Ageloff Appeal Mem. at 4–5; Trustee Appeal Mem. at 22–23.

ed[ ]" by the bankruptcy court and thereby moot Ageloff's arguments. Trustee Withdrawal Mem. at 15–16. It is my understanding, however, from reviewing the transcript of the oral argument on the motion to dismiss, that the bankruptcy court stayed decision on the motion to dismiss pending my decision on this motion. *See* Oral Argument Tr. at 27.[10] Second, the Trustee argues that because some of the defendants have not moved to dismiss, it would "make no sense" to withdraw the reference as against all the defendants. *See* Trustee Withdrawal Mem. at 16. Quite the contrary, it would "make no sense" to decline to withdraw the reference because some defendants have not made motions to dismiss. The parties that moved to dismiss raised matters which, as I have found, require withdrawal. It would be contrary to the very concept of mandatory withdrawal to deprive these parties of an obligatory right because other parties have chosen not to make motions to dismiss and not to seek withdrawal. In other words, non-moving defendants (whose assumed position, I note, is being articulated by the Trustee) should not be allowed to pull down a right to which the moving parties are entitled as a matter of law. Third, the Trustee argues that Ageloff only raised the Reform Act pleading issues as an "afterthought" in his reply brief in further support of the motions to dismiss. *See id.* Assuming this to be the case, Ageloff's failure to cite relevant case law does not alter my obligation to apply the law to the facts of this case, including, of course, the developing issues addressed in the Reform Act cases discussed *supra.* Finally, the Trustee contends that I can avoid the debate surrounding the pleading requirements of the Reform Act "because the Ageloff Complaint meets the most rigid standards imposed by any court." *Id.* This argument raises the very concern I noted at the outset of this discussion. It requires me to resolve the merits of the motion to dismiss before addressing the withdrawal motion, and this I refuse to do.

■ Even if the combined effect of the novel issue raised by the lift stay proceeding and the developing law with respect to pleading issues under the Reform Act was not enough to warrant mandatory withdrawal, and I believe that these factors are sufficient, there are additional factors that support withdrawal. Ageloff, in reliance upon *Alex, Brown & Sons Inc. v. Marine Midland Banks, Inc.,* No. 96 Civ. 2549(RWS), 1997 WL 97837 (S.D.N.Y. March 6, 1997), has raised the issue of whether the Trustee, on behalf of a clearing firm, has satisfied the "in connection with" requirement of Rule 10b–5. In opposing this argument, the Trustee attempts to distinguish *Alex, Brown* and discusses a considerable body of law addressed to the "in connection with" requirement. *See* Trustee's Memorandum of Law In Opposition to: The Motions to Dismiss of Defendants Ageloff, Ronan Garber, Dibella, Lembo, Mancino, Wolf and Danny Garber, [etc.], dated June 5, 1997, at 19–20 ("Trustee Dismissal Mem."); annexed as Ex. 6 to the Affidavit of Mitchell A. Lowenthal in Opposition to Defendants' Motions to Withdraw the Reference in Three Adversary Proceedings, sworn to on September 22, 1997. Even assuming, for the moment, that the Trustee is correct that *Alex, Brown* is distinguishable, this determination will require "significant interpretation" of non-bankruptcy law. Reviewing the arguments raised by the Trustee, and the *Alex, Brown* court's analysis, I conclude that resolution of this question will not entail "simple application" of the Exchange Act.

Finally, as I have mentioned, Ageloff's motion to dismiss this action has already been fully submitted, and the memoranda of law with respect thereto have been presented to me in connection with this motion. Thus, this case is perhaps unusual in that I have an opportunity to review the various substantive arguments raised by the parties with respect to the underlying claims in determining the extent to which these claims require "substantial and material" consideration of non-bankruptcy law. Having made such a review, it is clear to me that non-bankruptcy

---

**10.** Indeed, and consistent with this belief, to date, the bankruptcy court has not decided the pending motions to dismiss.

law not only dominates this proceeding, but that the claims raised herein, and the theories supporting them, are complex and require the type of analysis and consideration for which mandatory withdrawal is appropriate. In fact, in reviewing the Trustee's memorandum of law in opposition, I am struck by the fact that the overwhelming majority of cases cited by the Trustee were decided by Article III courts. *See* Trustee Dismissal Mem. Although not dispositive, this is an indication that the issues addressed in these motions are of a type which Article III courts have frequently been called upon to address. As a result, and for the other reasons discussed herein, Ageloff's motion to withdraw the reference in the Ageloff Proceeding is granted.[11]

### B. *The Gurian and National Union Proceedings*

Gurian and National Union also move to withdraw the reference in their respective proceedings. Gurian asserts that both the mandatory and discretionary prongs of section 157(d) apply. National Union only argues that discretionary withdrawal should apply. As is perhaps evident, this is a peculiar case. Pending before me are three motions to withdraw the reference in three integrally linked cases. With respect to one of these cases, I have already determined that withdrawal is mandated. With respect to the remaining two, I find, for the reasons set forth below, that because the reference must be withdrawn in the Ageloff Proceeding, the reference in these other proceedings should, as a discretionary matter, be withdrawn as well.

My analysis begins with the linkage between the three proceedings. As the Trustee correctly observes, these three proceedings arise from the same facts and involve similar legal issues. *See* Trustee Withdrawal Mem. at 1–2. In brief, assuming the truth of the Trustee's allegations, Gurian and others conspired to drive down the prices of the House Stocks, this in turn drove down Hanover's value, which in turn caused Ageloff and oth-

ers to attempt to drive up Hanover's value. When this latter scheme failed, Ageloff and his co-defendants allegedly attempted to bail out Hanover's favored customers. All of this relates back to Adler because Adler guaranteed these various sham transactions. Finally, the extent of National Union's liability, if any, depends, in part, upon whether these allegations are true and the precise nature of these schemes. Thus, while it is certainly correct that the causes of action in the three proceedings are not identical, and that other specific issues are not the same, the three proceedings are linked. In reaching this conclusion I also point out that the Gurian Complaint contains allegations that some of the defendants in the Gurian Proceeding extorted payments, in the form of bargain prices for stock, from the defendants in the Hanover Proceeding. *See* Gurian Complaint at ¶ 9. In addition, the Gurian defendants allegedly worked with the Hanover defendants to bring some of the House Stocks at issue to market. *See id.* at ¶ 7.

This brings the analysis to the question of whether permissive withdrawal over the Gurian and National Union Proceedings is warranted. In resolving this question, the Court of Appeals has set forth a series of factors to consider: (1) whether the proceedings raise core or non-core claims; (2) judicial economy; (3) uniformity of bankruptcy administration; (4) prevention of forum shopping; (5) economical use of the debtor's resources; (6) efficient and expeditious resolution of the bankruptcy process; and (7) whether a jury trial has been demanded. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1101 (2d Cir.1993), *cert. dismissed,* 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994). First, I should determine whether the underlying claims are core or non-core "since it is upon this issue that questions of efficiency and uniformity will turn". *Id.*

Here, I shall assume, without deciding, that the claims in both the Gurian and National Union Proceedings are core matters, thus giving the Trustee the benefit of

---

11. Because I consider the factors and circumstances addressed herein to be sufficient to warrant mandatory withdrawal, I do not consider

the other arguments raised by Ageloff, or the Trustee's and SIPC's responses to these arguments.

the doubt.[12] Although this assumption cuts against permissive withdrawal, it is not dispositive. In *Orion*, the Court of Appeals couched its sentences with respect to the implications of this determination in permissive terms. *See id.* at 1101–02 (discussing how the determination that a matter is core "could" lead to the conclusion that efficiency concerns dictate that the matter be heard by the bankruptcy court). Other courts have reached the same conclusion. *See, e.g., Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680, 686 (S.D.N.Y. 1995) (holding that the core v. non-core distinction is "not wholly determinative"). In the final analysis, the critical question is efficiency and uniformity. *See Orion*, 4 F.3d at 1100; *In re Houbigant*, 185 B.R. at 686.

 With respect to these concerns, and the factors outlined in *Orion*, I find that permissive withdrawal is appropriate in the Gurian and National Union Proceedings. My overriding reason for so holding is the overlapping and interlocking nature of these proceedings to the Ageloff Proceeding. The Ageloff Proceeding is being withdrawn because it must be withdrawn. Given that, it seems to make the most sense to adjudicate these three related cases in one forum before one court. To do otherwise would be to break up related cases in a manner that would only create inefficiency and wasted resources. In so finding, I also rely upon the fact that in the National Union Proceeding, the case is still in its early stages, and no motions have been filed. To date, it appears that National Union has only responded to initial discovery demands from the Trustee. *See* Windels Aff. at ¶ 11. With respect to the Gurian Proceeding, as noted previously, Gurian's motion to dismiss has been withdrawn and the automatic stay of discovery thereby lifted. Gurian has answered and demanded a trial by jury. Other than initial discovery matters (and this is not entirely clear on this record at this time), little appears to have taken place. *See* Reply Memorandum of Law of Defendant Philip Gurian In Support of His Motion for Withdrawal of the Reference to the Bankruptcy Court, dated October 6, 1997 ("Gurian Reply Mem.").

In opposing these efficiency and uniformity arguments, the Trustee emphasizes that Judge Garrity has devoted a considerable amount of time to this bankruptcy proceeding—holding countless hearings and issuing an equally large number of orders. *See* Trustee Withdrawal Mem. at 25–28 & App. B. This is certainly true. The Trustee also points out that in addition to being related to each other, these three proceedings are related to other proceedings before the bankruptcy court in which the parties have not sought withdrawal. *See id.* While these factors weigh against withdrawal, they do not ultimately dissuade me from doing so. The Ageloff Proceeding must be withdrawn, regardless of these concerns, because it involves significant and substantial consideration of non-bankruptcy law. Having reached that conclusion, to leave the Gurian and National Union Proceedings before the bankruptcy court would, on balance, result in greater inefficiency than withdrawing them here, in spite of whatever related actions may continue before the bankruptcy court. These three adversary proceedings are most related to each other and should be heard

---

12. This issue is the subject of some debate and a bit of confusion. In the Gurian Proceeding, the Gurian Complaint alleges that the claims are core. *See* Gurian Complaint at ¶ 14. Yet, in opposing Gurian's motion to withdraw, the Trustee appears to treat the claim as non-core inasmuch as he discusses Gurian's jury trial argument under a point heading addressed to non-core proceedings. *See* Trustee Withdrawal Mem. at 29–30. In addition, in the argument immediately following this section of the brief, the Trustee argues that the National Union Proceeding is core. *See id.* at 31–32. This is at least consistent with the allegation in the complaint. *See* National Union Complaint at ¶ 1. Nonetheless, the case the Trustee places primary reliance upon, *Hirsch v. London Steamship Owners' Mutual Life Ins. Assoc. (In re Seatrain Lines, Inc.)*, 198 B.R. 45 (S.D.N.Y.1996), has recently been criticized as a misapplication of Court of Appeals' precedent. *See In re Petition of McMahon*, No. 97 Civ. 8536(SAS), 1998 WL 61001, at *3 (S.D.N.Y. Feb. 11, 1998). Finally, this same confusion and uncertainty seems to have plagued the Ageloff Proceeding. There, the Trustee specifically alleged that the claims against Ageloff, but not all of his co-defendants, were non-core or "related to" claims. *See* Ageloff Complaint at ¶ 10. Yet, the August 8 Decision states, without analysis, that these claims are core. *See* August 8 Decision at 5. Under the circumstances, and given the cursory treatment this issue received in the briefs, I will defer ruling on this issue, to the extent that a further ruling on this issue is even required, to a later time when the issue can be more fully addressed.

together. In making this determination, I also rely upon the fact that although the Trustee lists, over some nine pages, the various orders that the bankruptcy court has issued in the various Adler proceedings thus far, *see* Trustee Withdrawal Mem., App. B, only one (a motion by Gurian's former attorneys to withdraw as counsel) appears to deal directly with either Gurian or National Union. *See* Gurian Reply Mem. at 7–8; Reply Memorandum of Law of National Union Fire Insurance Company of Pittsburgh, Pa. in Support of its Motion to Withdraw the Reference, dated October 6, 1997, at 3.

██ In sum, even assuming that the Gurian and National Union Proceedings are core matters, these cases should be heard together with the Ageloff Proceeding. As a result, the motions to withdraw the reference in both the Gurian and National Union Proceeding are granted.[13]

### CONCLUSION

For the reasons stated above, Ageloff's appeal from the August 8 Decision is granted, and that decision is hereby reversed and the August Order is hereby vacated. In addition, the reference in the Ageloff, Gurian and National Union Proceedings is hereby withdrawn.

SO ORDERED.

**13.** With respect to both mandatory and discretionary withdrawal, the Trustee suggests that if I decide to withdraw the reference, as in fact I have, I should allow the bankruptcy court to oversee pretrial proceedings and, with respect to the Ageloff Proceeding, issue proposed findings of fact and conclusions of law. *See Orion*, 4 F.3d at 1101–02 (discussing this procedure with respect to permissive withdrawal); *Pension Benefit Guaranty Corp. v. Pan Am Corp. (In re Pan Am Corp.)*, 133 B.R. 700, 703–04 (S.D.N.Y.1991) (discussing this procedure with respect to mandatory withdrawal). The decision whether to do so is discretionary. For the following reasons, I decline to do either and withdraw the reference at this stage in all three proceedings. First, so-called routine discovery in this case has already generated an important and novel issue of first impression, the lift stay appeal. By overseeing all pretrial matters, I will avoid any further argument with respect to this Court's appellate jurisdiction and prevent the type of unnecessary delay, expense and duplication of effort that withdrawal was intended to avoid. Second, although it is difficult at this stage to predict the likelihood that these matters will proceed to trial, especially in light of the pending motions to dismiss, I have found that in complicated cases such as this, oversight of the pretrial proceedings provides me with insight into the precise nature of the claims and the theories upon which they are based. For these same reasons, I further decline to submit the motion to dismiss to the bankruptcy court for proposed findings of fact and conclusions of law. This would only generate another level of briefing and expense since I have little doubt, given the tone of the briefing on the motions before me, that whatever the outcome of such a decision, one side would argue that it was in error.